IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF COLORADO, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. <u>1:17-cv-1554</u> |
| v. | ) ) | |
| ROCKY MOUNTAIN BOTTLE COMPANY, LLC. | ) ) ) | |
| Defendant. | ) | |

CONSENT DECREE

## TABLE OF CONTENTS

I.      JURISDICTION AND VENUE .................................................................3

II.     APPLICABILITY ...................................................................................3

III.    DEFINITIONS.........................................................................................4

IV.    COMPLIANCE REQUIREMENTS .....................................................11

V.     CIVIL PENALTY.................................................................................19

VI.    PERMITS.............................................................................................20

VII.   EMISSION CREDIT GENERATION .................................................22

VIII.  REPORTING REQUIREMENTS .........................................................23

IX.    REVIEW AND APPROVAL OF SUBMITTALS .................................26

X.     STIPULATED PENALTIES ................................................................27

XI.    FORCE MAJEURE .............................................................................32

XII.   DISPUTE RESOLUTION....................................................................35

XIII.  INFORMATION COLLECTION AND RETENTION ..........................38

XIV.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS.........................40

XV.   COSTS ................................................................................................42

XVI.  NOTICES............................................................................................43

XVII. SALES OR TRANSFER OF OPERATIONAL OR OWNERSHIP INTERESTS ...........44

XVIII. EFFECTIVE DATE.............................................................................46

XIX.  RETENTION OF JURISDICTION......................................................46

XX.   MODIFICATION ................................................................................46

XXI.  TERMINATION..................................................................................47

XXII. PUBLIC PARTICIPATION ................................................................48

XXIII. SIGNATORIES/SERVICE..................................................................48

XXIV. INTEGRATION ...........................................................................................................49

XXV.  APPENDICES ...........................................................................................................49

XXVI. JUDGMENT...............................................................................................................49

WHEREAS, concurrently with the lodging of this Consent Decree, Plaintiffs, the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), and the State of Colorado ("Colorado"), on behalf of the Colorado Department of Public Health and Environment ("CDPHE") have filed a Complaint in this action seeking civil penalties and injunctive relief from the Defendant, Rocky Mountain Bottle Company, LLC ("RMBC"), for alleged violations of the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*, with respect to emissions of nitrogen oxides ("NOx"), and sulfur dioxide ("SO₂"), at its container glass manufacturing facility in Wheat Ridge, Colorado ("Facility");

WHEREAS, the Complaint alleges that RMBC violated and/or continues to violate the Prevention of Significant Deterioration ("PSD") provisions in Part C of Subchapter I of the CAA, 42 U.S.C. §§ 7470-7492, the Non-attainment New Source Review ("Non-attainment NSR") provisions in Part D of Subchapter I of the CAA, 42 U.S.C. §§ 7501-7511f , the permitting requirements of CAA Subchapter V ("Title V"), 42 U.S.C. §§ 7661-7661f, regulations implementing those CAA provisions, and the federally enforceable Colorado state implementation plans ("SIP");

WHEREAS, the Complaint alleges that RMBC made major modifications to the Facility without obtaining the required CAA permits and without complying with the CAA's PSD and Non-attainment NSR requirements regarding the installation of pollution control technology, emission limits, monitoring, recordkeeping, and reporting;

WHEREAS, EPA issued a Notice of Violation on February 1, 2012, with respect to the Facility, attached as Appendix A hereto;

WHEREAS, EPA provided RMBC and Colorado with actual notice of the alleged violations, in accordance with Sections 113(a)(1) and (b) of the Clean Air Act, 42 U.S.C.§§ 7413(a)(1) and (b);

WHEREAS, RMBC has denied and continues to deny the violations alleged in the Complaint and in the Notice of Violation;

WHEREAS, Colorado is a co-Plaintiff in this matter, and Colorado is alleging analogous violations of Colorado's SIP and/or other state rules and regulations incorporating and implementing the aforementioned federal CAA requirements;

WHEREAS, EPA has selected glass manufacturing facilities (including container glass) as a national CAA enforcement priority;

WHEREAS, the United States, Colorado, and RMBC anticipate that the installation and operation of pollution control technology and other measures required by this Consent Decree will achieve reductions of emissions from the Facility, thereby improving air quality;

WHEREAS, the objectives of the United States in entering into this Consent Decree are to further the purposes of the CAA as described in CAA Section 101, 42 U.S.C. § 7401, to protect public health, public welfare, and the environment, to have RMBC perform the actions described below, and to ensure that RMBC achieves and maintains compliance with the CAA, applicable state law, and the terms and conditions of this Consent Decree and applicable CAA permits;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest;

2

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and has jurisdiction over the Parties. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law claims asserted by Colorado. Venue lies in this District pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because RMBC resides and is located in, RMBC's headquarters and principal place of business are located in, and RMBC conducts business in, this judicial district. For purposes of this Consent Decree or any action to enforce this Consent Decree, RMBC consents to venue in this judicial district and to this Court's jurisdiction over this Consent Decree, any such action to enforce the Consent Decree, and over RMBC.

2.      For purposes of this Consent Decree, RMBC agrees that the Complaint states claims upon which relief may be granted pursuant to the Clean Air Act and pursuant to the laws of the State of Colorado under the Court's supplemental jurisdiction.

## II.    APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon each Party and its successors, assigns, or other entities or persons otherwise bound by law.

4.      Until this Consent Decree has terminated pursuant to Section XXI (Termination) below, RMBC shall provide a copy of this Consent Decree to all officers, employees, and agents

whose duties include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.  Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree. Notwithstanding any retention of third parties to perform any work required under this Consent Decree, RMBC shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree.

5.      In any action to enforce this Consent Decree, RMBC shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree, unless RMBC establishes that such failure resulted from a Force Majeure event and RMBC has complied with all the requirements of Section XI of this Consent Decree.

## III.   DEFINITIONS

6.      Terms used in this Consent Decree that are defined in the CAA or in regulations promulgated pursuant to the CAA shall have the meanings assigned to them in the CAA or such regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "24-hour Block Average" shall be calculated by averaging all valid one-hour emissions data outputs (concentration or pounds) for a given Operating Day and using the daily glass production rates (in tons) on that Operating Day where applicable;

b.      "30-Day Rolling Average" shall be expressed as pounds of pollutant emitted per ton of glass produced calculated in accordance with the following formula and sub-paragraphs (i) and (ii) below:

$$30 - day\ average\ \frac{lb\ E}{ton} == \frac{COD_E\ (lbs) + P29D_E(lbs)}{COD_{Prod}\ (tons) + P29D_{Prod}(tons)}$$

Where:
30-Day average (lb E/ton) = the 30-Day Rolling Average.
E = Emissions of $NO_X$ or $SO_2$.
COD = Current Operating Day where the relevant 30-Day Rolling Average is the applicable limit and the CERMS measures at least one full hour of emission data.
$COD_E$ = The daily emissions as measured by a CERMS on the COD, in pounds.
$COD_{Prod}$ = Daily glass production on the COD, in tons of glass.
P29D = The Previous 29 Operating Days where the relevant 30-Day Rolling Average Emission Rate is the applicable limit and the CERMS measures at least one full hour of emission data.
$P29D_E$ = The sum of the daily $NO_X$ or $SO_2$ emissions as measured by a CERMS during the P29D, in pounds.
$P29D_{Prod}$ = The sum of the daily glass production during the P29D, in tons of glass.

      (i)     A new 30-Day Rolling Average shall be calculated for each new Operating Day where the 30-Day Rolling Average Emission Rate is the applicable standard and the CERMS measures at least one full hour of emission data. Any Operating Day where the newly calculated 30-Day Rolling Average exceeds the limit is a separate one-Day violation; and

      (ii)     As specified in Paragraphs 7-10 of this Consent Decree, certain Days may be excluded from the 30-Day Rolling Average;

      c.     "Abnormally Low Production Rate Day" shall mean any Operating Day where glass production at any Furnace is at or below 35% of permitted production (or design production, where there is no permitted production) as determined on a daily basis (as defined in the then-current Title V permit) for at least one continuous hour;

      d.     "Calendar Year" shall mean the period commencing on January 1 and ending on December 31 of the same year;

e.      "CDPHE" shall mean the Colorado Department of Public Health and

Environment and any of its successor departments or agencies;

f.      "CERMS" or "Continuous Emission Rate Monitoring System" shall mean,

for obligations involving $NO_X$ or $SO_2$ emissions and/or emission rates under this Consent

Decree, the total equipment required to sample, condition (if applicable), analyze, and provide a

written record of such emissions and/or emission rates, expressed on a continuous basis. Such

equipment includes, but is not limited to, sample collection and calibration interfaces, pollutant

analyzers, diluent analyzer (including oxygen monitor), stack gas volumetric flow monitors, and

data and recording and storage devices;

g.      "CERMS Certification" or "CERMS re-Certification" shall mean the

certification as specified in 40 C.F.R. § 60.13, and in accordance with 40 C.F.R. Part 60

Appendices B and F;

h.      "CERMS Certification Event" shall mean any Furnace Startup or First

Control Device Startup;

i.      "Cold Repair" shall mean the process of stopping glass production,

stopping the flow of fuel, fully cooling down a Furnace, replacing some or all of the refractory

in the Furnace, the crown, and/or the regenerators (if applicable), and re-starting the Furnace by

firing fuel and starting the production of glass. A Cold Repair, for the purposes of this Consent

Decree, does not include any refractory repairs conducted when the Furnace is still hot. A Cold

Repair also does not include emergency repairs in which the Furnace is cooled to ambient

temperature to conduct the repairs, or repairs to a Furnace that temporarily ceased Operation

6

due to economic reasons, provided the repairs in either instance do not include the replacement of more than 30 percent of the refractories in the Furnace;

j.      "Combined Stack" shall mean the stack through which all emissions from Furnaces B and C are passed. If one of the Furnaces is not Operating, then the "Combined Stack" emissions are represented by the remaining Operating Furnace for the purpose of demonstrating compliance with any limit;

k.      "Complaint" shall mean the complaint filed by the United States and Colorado in this action;

l.      "Consent Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXV (Appendices), below);

m.      "Continuous Operating Year" shall mean a Calendar Year during which a Furnace Operates on every Day of that Calendar Year;

n.      "Control Device" shall mean Scrubber System, Particulate Device, or similar add-on air pollution control device;

o.      "Control Method" shall mean a method used to reduce the creation of emissions from a Furnace, such as Oxyfuel;

p.      "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time for determining reporting deadlines under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day. The Day starts at 12:00 am and ends at 11:59 pm;

q.      "Defendant" or "RMBC" shall mean Rocky Mountain Bottle Company,

LLC;

r.      "Effective Date" shall have the definition provided in Section XVIII

(Effective Date);

s.      "Emissions Credit(s)" shall mean an authorization or credit to emit a

specified amount of $NO_X$, $SO_2$, or PM that is allocated or issued under an emissions trading or

marketable permit program of any kind established under the CAA or a SIP;

t.      "EPA" shall mean the United States Environmental Protection Agency

and any of its successor departments or agencies;

u.      "Facility" shall mean RMBC's container glass manufacturing facility

located at 10619 West 50th Avenue, Wheat Ridge, Colorado;

v.      "First Control Device Startup" shall mean the initial startup of a Control

Device, and shall represent the period of time from the Control Device's commencement of

operation until operation of the device is stable and the device has achieved normal operating

conditions; however, this period shall not exceed thirty (30) Days;

w.      "Furnace" means an emissions unit comprised of a refractory-lined vessel

in which raw materials are charged and melted at high temperature to produce molten glass;

x.      "Furnace Startup" shall mean the period of time during which a Furnace's

refractory is heated from ambient temperature to the temperature at which glass is normally

produced. A Furnace Startup shall last no more than 30 Days and includes the slow heating of

the Furnace refractory, initially with portable burners and transitioning to main burners once the

Furnace reaches a temperature at which they can commence operation. Furnace Startup also

includes the initial filling of the furnace, following the heat-up, with cullet and/or raw materials, to a level at which production launch can commence;

y.     "Hot Spot Temperature" shall mean the highest temperature of the Furnace sidewall between the tuck stone (approximately 18" above the glass line) and the crown skew (where the Furnace crown meets the Furnace sidewall) (also referred to as the Furnace "breastwall refractory");

z.     "Maintenance" shall mean activities necessary to keep the Control Devices in normal operating condition, as described in Paragraph 13;

aa.     "Malfunction" shall mean, consistent with 40 C.F.R. § 60.2, any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner, but shall not include failures that are caused in part by poor maintenance or careless operation;

bb.     "Month" shall mean a calendar month;

cc.     "New Source Review" or "NSR" shall mean the PSD and Non-attainment NSR provisions in Parts C and D of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7492, 7501-7515, applicable federal regulations implementing such provisions of the CAA, and the corresponding provisions of federally enforceable SIPs and Colorado law;

dd.     "$NO_X$" shall mean the sum of oxides of nitrogen in the flue gas, collectively expressed as $NO_2$;

ee.     "Operate," "Operation," "Operating," and "Operated" shall mean any time that fuel is fired in a Furnace;

ff.     "Operating Day" shall mean any Day during which fuel is fired into a

Furnace;

gg.     "Oxyfuel Furnace" shall mean a Furnace in which the gas that provides

the oxidant for combustion of the fuel is composed of greater than or equal to 90 percent

oxygen.

hh.     "Paragraph" shall mean a portion of this Consent Decree identified by an

Arabic numeral;

ii.     "Particulate Device" and "PD" shall mean a control device that uses

filtration technology to reduce Particulate Matter emissions, including, but not limited to,

electrostatic precipitators, baghouses, and ceramic filter systems;

jj.     "Parties" shall mean the United States on behalf of EPA, the State of

Colorado on behalf of CDPHE, and RMBC;

kk.     "RMBC" shall mean Rocky Mountain Bottle Company, LLC;

ll.     "Scrubber System" shall mean a type of system known sometimes as a

sorbent injection system which involves the addition of an alkaline material into the gas stream

to react with the acid gases.  The acid gases react with the alkaline sorbents to form solid salts.

(i)     Semi-dry Scrubber System – The system described above with the

sorbent in an aqueous phase which improves collection efficiency.

(ii)     Dry Scrubber System – The system described above with no

moisture added in the reaction chamber or reaction area.

mm.   "Section" shall mean a portion of this Consent Decree identified by an

uppercase roman numeral;

nn.   "State" shall mean the State of Colorado, on behalf of CDPHE;

oo.   "Ton" or "tons" shall mean short ton or short tons (equal to 2000 pounds);

pp.   "United States" shall mean the United States of America, acting on behalf

of EPA;

## IV.   COMPLIANCE REQUIREMENTS

7.   Combined Stack. Beginning on March 31, 2019, whenever any Furnace is

Operated, all stack gases from that Furnace must pass through the Combined Stack and be

measured by the CERMS. If one of the Furnaces is not Operating or is operating during the first

seven (7) days of a Furnace Startup, then the "Combined Stack" emissions are represented by the

remaining Operating Furnace for the purpose of demonstrating compliance with any limit.

8.   $NO_X$ Emission Limits, Controls, and Compliance Schedules

a.   $NO_X$ Emission Controls: By no later than March 31, 2019, RMBC shall no

longer Operate Furnace A, and shall only Operate Furnaces B and C as Oxyfuel Furnaces.

RMBC shall install, maintain and Operate each Oxyfuel Furnace such that the gas that provides

the oxidant for combustion of the fuel is at least 90 percent oxygen.

b.   Final $NO_X$ Emission Limit (30-day Rolling Average): Beginning no later

than March 31, 2019, RMBC shall emit no more than 1.1 lb $NO_X$/ton on a 30-day Rolling

Average from the Combined Stack as measured using a $NO_X$ CERMS except:

(i)   Abnormally Low Production Rate Days. RMBC may exclude

Abnormally Low Production Rate Days from the 30-day Rolling Average. During each Day

excluded from the 30-day Rolling Average, a $NO_X$ CERMS shall be used to demonstrate

RMBC's compliance with the following pound per day $NO_X$ limit on a 24-hour Block Average:

11

$$NO_{X\,Abn} = 1.1 \frac{lb\,NO_X}{ton} \times P$$

Where:     P = Combined maximum production capacity for all furnaces Operating during the Abnormally Low Production Rate Day (tons/day).

(ii)     <u>Furnace Malfunction and Furnace Maintenance</u>. RMBC may exclude Operating Days during a Furnace Malfunction or Furnace Maintenance from the 30-Day Rolling Average. During each Day excluded from the 30-day Rolling Average, a $NO_X$ CERMS shall be used to demonstrate RMBC's compliance with the following pound per day $NO_X$ limit on a 24-hour Block Average:

$$NO_{XMaint,Malf} = 1.1 \frac{lb\,NO_X}{ton} \times P_{norm} + 2.4 \frac{lb\,NO_X}{ton} \times P_{Maint,Malf}$$

Where:     $P_{norm}$ = The production from any Furnace not experiencing a Furnace Malfunction or Furnace Maintenance event, if any (tons/day)
$P_{Maint,Malf}$ = The production capacity for all furnaces experiencing a Furnace Malfunction or Furnace Maintenance event (tons/day).

(iii)     <u>$NO_X$ Limit during the 1st through 30th day of Furnace Startup</u>. For the Furnace Startup period (Days 1-30), RMBC must pass all Furnace exhaust through the Combined Stack and through all Control Devices that are not undergoing a First Control Device Startup but shall exclude the emissions from all Furnaces from the 30-day rolling average. During the Day(s) excluded from the 30-day rolling average, except for Day(s) which are Abnormally Low Production Rate Day(s) covered by the NOx limit in subparagraph 8.b(i), a $NO_X$ CERMS shall be used to demonstrate RMBC's compliance with the following pound per day $NO_X$ limit on a 24-hour Block Average:

12

$$NO_{X\ Startup} = 1.1\ \frac{lb\ NO_X}{ton}\ x\ Normal\ Prod + 2.4\ \frac{lb\ NO_X}{ton}\ x\ Startup\ Prod$$

Where:  Normal Prod = Production of Furnaces that are Operating and not undergoing Furnace Startup.
Startup Prod = Production of Furnaces that are undergoing Furnace Start Up.

9.  $SO_2$ Emission Limits, Controls, and Compliance Schedules.

a. <u>$SO_2$ Emission Control Devices</u>: Beginning no later than March 31, 2019, RMBC shall pass all stack gases from each Operating Furnace (except during a Control Device Malfunction; or during Control Device Maintenance) through a continuously operating Scrubber System. While the Scrubber is operating, RMBC shall continuously operate it according to all applicable vendor recommendations in order to minimize emissions.

b. <u>Final $SO_2$ Emission Limit (30-day Rolling Average)</u>: Beginning no later than March 31, 2019, RMBC shall emit no more than 0.8 lb $SO_2$/ton on a 30-day Rolling Average from the Combined Stack as measured using a $SO_2$ CERMS except:

(i) <u>Abnormally Low Production Rate Days</u>. RMBC may exclude Abnormally Low Production Rate Days from the 30-day Rolling Average. During each Day excluded from the 30-day Rolling Average, a $SO_2$ CERMS shall be used to demonstrate RMBC's compliance with the following pound per day $SO_2$ limit on a 24-hour Block Average:

$$SO_{2\ Abn} = 0.8\ \frac{lb\ SO_2}{ton} \times P$$

Where:  P = Combined maximum production capacity for all Furnaces Operating during the Abnormally Low Production Rate Day (tons/day).

(ii) <u>First Control Device Startup, Control Device Malfunction and Control Device Maintenance</u>. RMBC may exclude Operating Days with First Control Device

13

Startup, Control Device Malfunction, or Control Device Maintenance from the 30-Day Rolling

Average. During each Day excluded from the 30-day Rolling Average, a $SO_2$ CERMS shall be

used to demonstrate RMBC's compliance with the following pound per day $SO_2$ limit on a 24-

hour Block Average:

$$SO_{2\frac{w}{o}\ control\ device} = 2.5\frac{lb\ SO_2}{ton} \times P$$

Where:     P = Combined maximum production capacity for all
furnaces Operating during the First Control Device Startup,
Control Device Malfunction or Control Device
Maintenance Day (tons/day).

(iii)   <u>$SO_2$ Limit during the 1st through 30th day of Furnace Startup</u>. For

the Furnace Startup period (Days 1-30), RMBC must pass all Furnace exhaust through the

Control Device but shall exclude the emissions from all Furnaces from the 30-day rolling

average. During the Day(s) excluded from the 30-day rolling average, except for Day(s) which

are Abnormally Low Production Rate Day(s) covered by the $SO_2$ limit in subparagraph 9.b(i), a

$SO_2$ CERMS shall be used to demonstrate RMBC's compliance with the following pound per

day $SO_2$ limit on a 24-hour Block Average:

$$SO_{2\ Startup} = 0.8\frac{lb\ SO_2}{ton}\ x\ Normal\ Prod + 2.5\ \frac{lb\ SO_2}{ton}\ x\ Startup\ Prod$$

Where:     Normal Prod = Production of Furnaces that are Operating
and are not undergoing Furnace Startup.
Startup Prod = Production of Furnaces that are undergoing
Furnace Startup.

10.    CERMS - Installation, Calibration, Certification, Maintenance, and Operation.
RMBC shall install, calibrate, certify, maintain and operate a $NO_X$ and $SO_2$ CERMS on the
Combined Stack in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to
CERMS, and with Part 60 Appendices B and F, including the applicable performance
specification tests of 40 C.F.R. Part 60, Appendix B. The CERMS must be installed and certified
no later than ninety (90) Days after this Consent Decree is lodged with the Court.

a.    The CERMS shall continuously monitor and record the hourly $NO_X$ and
$SO_2$ emission rates in pounds per hour ("lb/hr") from the Combined Stack during each
Operating Day.

b.    The CERMS shall measure emissions after the Control Devices, unless
emissions bypass any Control Devices, and then the emissions must be measured after any
operating Control Devices, but prior to being emitted to the atmosphere.

c.    At the end of each Operating Day, the data acquisition and handling
system shall divide the total daily emissions in pounds per day from the Combined Stack for
valid CERMS hourly data by the total tons of glass produced/pulled during the Operating Day
for all Operating Furnaces (reduced proportionally based on the valid CERMS data hours) to
describe the pound per ton emission rate for the Operating Day. The resulting number shall be
recorded in units of pounds of pollutant per ton of glass produced/pulled for the applicable
Operating Day.

d.    RMBC must comply with all monitoring, recordkeeping, and reporting
requirements in 40 C.F.R. § 60.13, and 40 C.F.R. Part 60, Appendix B (Performance
Specifications 2, 3 and 6).

e.     CERMS Certification and CERMS re-Certification Events. RMBC shall

not perform CERMS Certifications or CERMS re-Certifications during Abnormally Low

Production Rate Days, Furnace Startup, a First Control Device Startup, Malfunction, or

Maintenance. By no later than the first Operating Day after any CERMS Certification Event

concludes, a new CERMS Certification or CERMS re-Certification shall be performed for the

Combined Stack. If a CERMS Certification Event occurs, the requirement to demonstrate

compliance continuously with the final $NO_X$ or $SO_2$ emission limits required hereunder will be

suspended until CERMS Certification or CERMS re-Certification is complete but no more than

ten (10) Days (provided that the seven-day test required for CERMS Certification in 40 C.F.R.

Part 60 is commenced on the first Operating Day following the conclusion of the CERMS

Certification Event).

11.     Good Air Pollution Control Practice. At all times, including during Abnormally

Low Production Rate Days, a Furnace Startup, a First Control Device Startup, Malfunction, and

Maintenance, RMBC shall maintain and operate all Furnaces, all Control Devices and Methods,

and any other associated air pollution control equipment in accordance with 40 C.F.R. §

60.11(d).

12.     Alternative Control Technologies.  At any time prior to termination of this

Consent Decree, RMBC may request approval from EPA and CDPHE to implement other

control technology for $NO_X$ or $SO_2$ than what is required by this Consent Decree.  In seeking

such approval, RMBC must demonstrate that such alternative control technology is capable of

achieving pollution reductions equivalent to the technology required in Paragraphs 8 and 9.

RMBC must also demonstrate that it can achieve monitoring equal to or better than what is

required in Paragraph 10.  Approval or denial of such a request will be made by EPA after consultation with CDPHE.

  13. <u>Maintenance</u>.

    a. <u>Scheduled or Preventive Furnace Maintenance</u>.  Any Operating Day that is excluded from the applicable 30-day Rolling Average Limit because of Maintenance being performed on a Furnace, is subject to the following restrictions and must comply with the following requirements:  Scheduled or preventive Furnace Maintenance shall not exceed ninety-six (96) Operating hours annually and shall be conducted only when any downstream Control Devices are operating.

    b. <u>Scheduled or Preventive Maintenance on Control Devices</u>. Any Operating Day that is excluded from the applicable 30-day Rolling Average because of Maintenance being performed on a Control Device, is subject to the following restrictions and must comply with the following requirements: Scheduled or preventive Maintenance of Control Devices shall occur and shall be completed while the Furnace(s) connected to the Control Device(s) is not operating, unless any Furnace connected to the Control Device is scheduled to have a Continuous Operating Year. During a Continuous Operating Year, scheduled or preventive Maintenance on the Control Devices may be conducted while the Furnace(s) connected to the Control Device(s) is Operating; however, Maintenance lasting greater than twenty-four (24) consecutive hours shall occur only during Abnormally Low Production Rate Days. All Control Device Maintenance occurring during a Continuous Operating Year must also be performed in accordance with the following requirement:

(i)      Bypassing a Control Device for the purpose of preventive

Maintenance on the Control Device shall not exceed six (6) Days per Calendar Year. Bypass of

one Control Device required as a result of bypassing another shall count towards the six (6) Day

limit.

14.      <u>Recordkeeping.</u>

a.      For each Operating day, RMBC shall record the following (including

calculations and supporting data and information):

(i)      The mass emission rate of $NO_X$ and $SO_2$ in lb/hr;

(ii)      The tons of glass produced or pulled from each Furnace;

(iii)      The mass emission rate of $NO_X$ and $SO_2$ in lb/ton;

(iv)      The calculated 30-day Rolling Average for $NO_X$ and $SO_2$ in lb/ton,

unless emissions during that Day are excluded from the 30-day Rolling Average;

and

(v)      For any Operating Day(s) that RMBC excludes from the relevant

30-day Rolling Average, it shall record: 1) the date; 2) the relevant exception pursuant to which

RMBC is excluding the emissions generated during that Operating Day (or Days) (i.e.

Abnormally Low Production Rate Day, Furnace Startup, Control Device Startup, Malfunction,

or Maintenance); and 3) a calculation of the applicable emission limit (in pounds of $NO_X$ and/or

$SO_2$ per day) according to the equations listed above in Paragraphs 8 and 9.

b.      <u>Recordkeeping During Furnace Startup</u>. In addition to the recordkeeping

requirements listed above, RMBC must also keep the following records during Furnace Startup:

18

(i)      The amount of sulfur added to the batch materials for that Furnace in lb/ton of total batch material (including cullet);

(ii)     The total natural gas usage in that Furnace (in million standard cubic feet); and

(iii)    Any Hot Spot Temperature (measured at least once per shift).

## V.    CIVIL PENALTY

15.    Within thirty (30) Days after the Effective Date of this Consent Decree, RMBC shall pay the following amounts as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court at the rate specified in 28 U.S.C. § 1961 as of that date:

a.    $237,500 to the United States, and

b.    $237,500 to the State of Colorado.

16.    RMBC shall pay the civil penalty due to the United States by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to RMBC, following entry of the Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the District of Colorado, 1225 17th Street, Suite 700, Denver, CO 80202, (303) 454-0100. At the time of payment, RMBC shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, to the United States in accordance with Section XVI of this Decree (Notices); by email to CINWD_acctsreceivable@epa.gov; and by mail to:

EPA Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

This transmittal letter shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States, et al. v. Rocky Mountain Bottle Company, LLC, (D. Colorado), and shall reference the civil action number and DOJ case number 90-5-2-1-10146.

17.     RMBC shall pay the civil penalty due to CDPHE by certified, corporate or cashier's check made payable to the Colorado Department of Public Health and Environment and delivered to the attention of Enforcement Unit Supervisor, Air Pollution Control Division, 4300 Cherry Creek Drive South, APCD-SS-B1, Denver, Colorado 80246-1530.

18.     RMBC shall not deduct any penalties paid under this Consent Decree pursuant to this Section or Section X (Stipulated Penalties) in calculating its federal or Colorado income tax.

## VI.     PERMITS

19.     Where any compliance obligation under this Consent Decree requires RMBC to obtain a federal, state, or local permit, RMBC shall submit complete applications two hundred (200) Days before beginning actual construction of the Control Device or Control Method to obtain any pre-construction permits or modifications required to install and operate Control Devices, Control Methods, and CERMS required under Section IV (Compliance Requirements). Operating permit applications, other than minor modifications, will be submitted within twelve (12) months of startup as required by Colorado Regulation 3, Part C, Section III.B.2. RMBC will not begin actual construction prior to obtaining any required federal, state, or local permits. RMBC shall cooperate with EPA and the relevant state and/or local permitting agencies by submitting to the applicable agency, within fifteen (15) business days of any request, all available information that is necessary for the permit application that the applicable agency seeks following its receipt of these permit applications. RMBC may seek relief under the provisions of

Section XI of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit required to fulfill such obligation, if RMBC has submitted complete applications, and complete responses to requests for additional information, within the timeframes specified in this Paragraph. If RMBC fails to submit a timely permit application, or a timely response to any request for additional information, RMBC shall be barred from asserting a claim under Section XI (Force Majeure) of the Consent Decree that is based on delays in receiving necessary permits.

20.     Using the procedures set forth in Section XVI (Notices), RMBC shall provide EPA with a contemporaneous copy of each application for a federally enforceable permit necessary to implement the requirements of this Consent Decree that is filed after the Effective Date, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment opportunity.  If, as of the Effective Date, RMBC has received any permit necessary to implement the requirements of this Consent Decree and such permits have not already been submitted to EPA prior to the Effective Date, then no later than thirty (30) Days after the Effective Date, RMBC shall submit copies of such permits to EPA using the procedures set forth in Section XVI (Notices).

21.     If not included as part of the permit applications described above, by no later than one year after each compliance deadline for the final emission limits specified in Section IV (Compliance Requirements), RMBC shall also apply for either: 1) a federally enforceable permit issued either by EPA or pursuant to the applicable SIP, or 2) an amendment to the applicable SIP. The application shall request that the federally enforceable permit or SIP Amendment

incorporate and require RMBC's compliance with the following requirements specified in

Section IV (Compliance Requirements) of the Consent Decree:

       a.     Any applicable final emission limits required by Paragraphs 7, 8(b)-(d),

and 9(c) hereof, as well as the specified method of measuring and calculating emissions and

averaging periods;

       b.     Requirements to install, calibrate, certify, maintain, and operate $NO_X$ and

$SO_2$ CERMS pursuant to Paragraph 10;

       c.     Requirements to Operate in accordance with 40 C.F.R. § 60.11(d)

pursuant to Paragraph 11; and

       d.     Any recordkeeping requirements associated with the Furnaces Control

Devices, and Control Methods pursuant to Paragraph 14.

       22.     This Consent Decree shall not terminate until the requirements set forth in

Paragraph 21 are incorporated into a federally enforceable permit or SIP Amendment for the

Facility.

### VII.   EMISSION CREDIT GENERATION

       23.     RMBC may not use, purchase, or otherwise obtain Emission Credits in order to

comply with the requirements of this Consent Decree. For any and all actions taken by RMBC to

comply with the requirements of this Consent Decree, any emission reductions shall not be

considered a creditable contemporaneous emission decrease for the purpose of obtaining netting

reductions and offsets under the Clean Air Act's PSD and Nonattainment NSR programs

respectively. However, nothing in the Consent Decree shall preclude RMBC from using, selling

or transferring Emissions Credits that may be generated as a result of:

a.      Activities that reduce emissions from the Facility before the Effective Date, except for activities undertaken before the Effective Date to comply with any requirement of Section IV (Compliance Requirements) of the Consent Decree.

b.      Achievement and maintenance of emission rates (including through permanent closure of a Furnace) at the Facility below the emission limits required by Section IV (Compliance Requirements) so long as RMBC timely reports the generation of such surplus Emissions Credits in accordance with Section VIII (Reporting Requirements) of the Consent Decree. For purposes of this Paragraph, surplus $NO_X$ and/or $SO_2$ Credits are limited to the tons of $NO_X$ and/or $SO_2$ that RMBC removed from its emissions that are in excess of the emissions reductions required by Section IV (Compliance Requirements) of the Consent Decree.

24.      Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Consent Decree from being considered by EPA or a state as creditable contemporaneous emission decreases for the purposes of attainment demonstrations submitted pursuant to Section 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on NAAQS, PSD increments, or air quality-related values, including visibility in a Class I area.

## VIII.   <u>REPORTING REQUIREMENTS</u>

25.      Beginning thirty (30) Days after the end of the first full calendar quarter following the Effective Date of this Consent Decree, and continuing on an annual basis until termination of this Decree, RMBC shall submit pursuant to Section XVI (Notices) to EPA and CDPHE a progress report that contains the following information for the preceding annual period (or portion of the annual period for the first report): 1) the status of RMBC's progress toward implementing Section IV (Compliance Requirements), including a description of completed requirements; 2)

any problems encountered or anticipated in implementing Section IV (Compliance Requirements), together with implemented or proposed solutions; 3) a summary of all permitting activity pertaining to compliance with the Consent Decree and the status of any necessary permit applications; 4) for the Combined Stack, a tabulation of the 30-Day Rolling Averages for $NO_X$ and $SO_2$ and 365-Day Rolling Averages for $NO_X$; 5) the actual emissions of $NO_X$ and $SO_2$ per Month from the Combined Stack, measured using CERMS; 6) the results of any source/stack testing performed at the Combined Stack or at any Furnace; 7) identification and description of all Abnormally Low Production Rate Days, Furnace Startups, Control Device Startups, Malfunctions, Maintenance, and CERMS downtime; and 8) any other information required to be recorded or reported pursuant to Section VIII (Reporting Requirements). Each annual report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation and the likelihood of its recurrence.

26.     If RMBC violates, or has reason to believe that it may violate, any requirement of this Consent Decree, RMBC shall notify the United States, EPA, and CDPHE of such violation and its likely duration, in writing and by telephone, fax, or email, within ten (10) Days of the Day RMBC first becomes aware of the violation or potential violation. This notice shall provide an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, RMBC shall explain this in the report. RMBC shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within thirty (30) Days of the Day RMBC first becomes aware of the

cause of the violation. Nothing in this Paragraph or the following Paragraph relieves RMBC of its obligation to provide the notice required by Section XI (Force Majeure) of this Consent Decree.

27.     Whenever any violation of this Consent Decree or any other event affecting RMBC's performance under this Consent Decree, or affecting the performance of a Furnace, may pose an immediate threat to the public health or welfare or the environment, RMBC shall notify EPA and CDPHE orally or by electronic or facsimile transmission as soon as possible, but in no case no later than twenty-four (24) hours after RMBC first knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

28.     All reports shall be submitted to the persons designated in Section XVI (Notices) of this Consent Decree.

29.     Each report submitted by RMBC under this Section shall be signed by a plant manager, a corporate official responsible for environmental management and compliance, or a corporate official responsible for plant management, and shall include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

30.     The reporting requirements of this Consent Decree do not relieve RMBC of any

reporting obligations required by the Clean Air Act or its implementing regulations, or by any

other federal, state, or local law, regulation, permit, or other requirement.

31.     Any information provided pursuant to this Consent Decree may be used by the

United States or the State of Colorado in any proceeding to enforce the provisions of this

Consent Decree and as otherwise permitted by law.

## IX.     REVIEW AND APPROVAL OF SUBMITTALS

32.     Where this Consent Decree requires that RMBC seek approval (other than

applying for a Permit) before undertaking any action, EPA will review the plan, report, or other

item and, after consultation with CDPHE, shall in writing:

    a.     approve the submission; or

    b.     disapprove the submission.

33.     If the submission is approved pursuant to the preceding Paragraph, RMBC shall

take all actions required by the plan, report, other document, or this Consent Decree.

34.     If the submission is disapproved pursuant to sub-paragraph 32.b, RMBC shall,

either: (i) within forty-five (45) Days or such other time as the Parties agree to in writing, correct

all deficiencies and resubmit the plan, report, or other item, for approval, in accordance with the

preceding Paragraphs; or (ii) submit the matter to Dispute Resolution under Section XII (Dispute

Resolution) of this Consent Decree.  If the resubmission is approved, RMBC shall proceed in

accordance with the preceding Paragraph.

35.     Any stipulated penalties applicable to the original submission, as provided in

Section X of this Decree (Stipulated Penalties), shall accrue during the forty-five (45)-Day

period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved.

36.      If a resubmitted plan, report, or other item is disapproved, EPA, after consultation with CDPHE, may again require RMBC to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies, subject to RMBC's right to invoke Dispute Resolution and the right of EPA, after consultation with CDPHE, to seek stipulated penalties as provided in the preceding Paragraphs.

## X.      STIPULATED PENALTIES

37.      RMBC shall be liable for stipulated penalties to the United States and CDPHE for violations of the Consent Decree as specified below, unless excused under Section XI (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

38.      Late Payment of Civil Penalty. If RMBC fails to pay the civil penalty required to be paid under Section V (Civil Penalty) of this Consent Decree when due, RMBC shall pay a stipulated penalty of $5,000 per Day for each Day that the payment is late, plus interest accruing from the date the payment was due at the rate specified in 28 U.S.C. § 1961 as of the due date.

39.      Compliance Milestones

a.      Emission Limits. The following stipulated penalties shall accrue per violation per Day for each violation of the Final $NO_X$ Limit required under sub-paragraph IV.8.b

(Final NO$_X$ Emission Limit (30-Day Rolling Average)), and for each violation of the Final SO$_2$ Limit required under sub-paragraph IV.9.b (Final SO$_2$ Emission Limit (30-Day Rolling Average)):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $3,000 | 1st through 14th Day |
| $5,000 | 15th through 30th Day |
| $10,000 | 31st Day and beyond |

(i)     For the purpose of determining stipulated penalties under this sub-paragraph, Days of noncompliance are cumulative from the Effective Date and need not be continuous. Any Operating Day where the 30-Day Rolling Average NO$_X$ limit is exceeded is a separate one (1) Day violation. Any Operating Day where the 30-Day Rolling Average SO$_2$ limit is exceeded is a separate one (1) Day violation.

b.     Compliance Deadlines for Installing Control Devices or Control Methods. The following stipulated penalties shall accrue per violation per Day for each violation of any compliance deadline specified in Section IV (Compliance Requirements) of this Consent Decree regarding the installation and operation of Control Devices or Control Methods:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $2,250 | 1st through 14th Day |
| $3,500 | 15th through 30th Day |
| $5,000 | 31st Day and beyond |

c.     Installation, Calibration, Certification, Operation, and Maintenance of CERMS. The following stipulated penalties shall accrue per violation per Day for each violation of any requirement identified in Section IV (Compliance Requirements) of this Consent Decree regarding the installation, calibration, certification, operation and/or maintenance of a CERMS

28

by the specified deadlines, and per violation per Day for each violation of any other requirement of Paragraph 10:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 30th Day |
| $1,500 | 31st through 60th Day |
| $2,500 | 61st Day and beyond |

       (i)     For the purpose of determining stipulated penalties under this Paragraph, Days of noncompliance are cumulative from the Effective Date and need not be continuous. Any Operating Day where there is a violation of any requirement identified in Section IV (Compliance Requirements) of this Consent Decree regarding the installation, calibration, certification, operation and/or maintenance of a CERMS is a separate one (1) Day violation.

       d.     <u>Reporting Requirements</u>. The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Section VIII (Reporting Requirements) of the Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $250 | 1st through 14th Day |
| $500 | 15th through 30th Day |
| $1,000 | 31st Day and beyond |

       e.     <u>Permitting Requirements</u>. The following stipulated penalties shall accrue per Violation per Day for each violation of any permitting requirement identified in Section VI (Permits) of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1,250 | 15th through 30th Day |
| $2,000 | 31st Day and beyond |

      f.    <u>Other Violations</u>. The following stipulated penalties shall accrue per violation per Day for each violation of any other requirement or prohibition of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1,250 | 15th through 30th Day |
| $2,000 | 31st Day and beyond |

      40.    Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree. Per day violations do not increase from one tier to the next unless the violations are continuous, except as otherwise provided herein.

      41.    RMBC shall pay stipulated penalties to the United States and CDPHE within thirty (30) Days of a written demand by either Plaintiff, unless RMBC elects within twenty (20) Days of receipt of the written demand to dispute the obligation in accordance with Section XII (Dispute Resolution) below. Stipulated penalties shall be payable as follows: fifty (50) percent to the United States and fifty (50) percent to CDPHE. The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.

42.     Either Plaintiff may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

43.     Stipulated penalties shall continue to accrue as provided in Paragraph 40, during any Dispute Resolution, but need not be paid until the following:

a.     If the dispute is resolved by agreement or by a decision of the United States that is not appealed to the Court, RMBC shall pay accrued penalties agreed or determined to be owing, together with interest accruing from the date RMBC received the written demand pursuant to Paragraph 41 at the rate specified in 28 U.S.C. § 1961 as of that date, to the United States or CDPHE within thirty (30) Days of the effective date of the agreement or the receipt of EPA's or CDPHE's decision or order.

b.     If the dispute is appealed to the Court and the United States or CDPHE prevails in whole or in part, RMBC shall pay all accrued penalties determined by the Court to be owing, together with interest accruing from the date RMBC received the written demand pursuant to Paragraph 41 at the rate specified in 28 U.S.C. § 1961 as of that date, within sixty (60) Days of receiving the Court's decision or order, except as provided in sub-paragraph c, below.

c.     If any Party appeals the District Court's decision, RMBC shall pay all accrued penalties determined to be owing, together with interest accruing from the date RMBC received the written demand pursuant to Paragraph 41 at the rate specified in 28 U.S.C. § 1961 as of that date, within fifteen (15) Days of receiving the final appellate court decision.

44.     RMBC shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 16, except that the transmittal

letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid. RMBC shall pay stipulated penalties owing to CDPHE in the manner set forth in Paragraph 17.

45.     Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Consent Decree.

46.     If RMBC fails to pay stipulated penalties according to the terms of this Consent Decree, RMBC shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due, together with additional penalties and administrative costs to the extent allowed by applicable law. Nothing in this Paragraph shall be construed to limit the United States or CDPHE from seeking any remedy otherwise provided by law for RMBC's failure to pay any stipulated penalties.

47.     Subject to the provisions of Section XIV (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or Colorado for RMBC's violation of this Consent Decree or applicable law. Where a violation of this Consent Decree is also a violation of the Clean Air Act, its implementing regulations, or an analogous provision of Colorado law, RMBC shall be allowed a credit, for any stipulated penalties paid, against any statutory or regulatory penalties imposed for such violation.

## XI.     FORCE MAJEURE

48.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of RMBC, any entity controlled by RMBC, or RMBC's

contractors, that delays or prevents the performance of any obligation under this Consent Decree despite RMBC's best efforts to fulfill the obligation. The requirement that RMBC exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event: (a) as it is occurring and (b) after it has occurred in order to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" does not include RMBC's financial inability to perform any obligation under this Consent Decree.

49.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, RMBC shall provide notice orally or by electronic or facsimile transmission to EPA and CDPHE, within ten (10) days of when RMBC first knew that the event might cause a delay. Within thirty (30) Days thereafter, RMBC shall provide in writing to EPA and CDPHE an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; RMBC's rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of RMBC, such event may cause or contribute to an endangerment to public health, welfare or the environment. RMBC shall include with any notice all available documentation supporting the claim that the delay was attributable to a Force Majeure. Failure to comply with the above requirements shall preclude RMBC from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. RMBC shall be deemed to know of any

circumstance of which RMBC, any entity controlled by RMBC, or RMBC's contractors knew or should have known.

50.     If EPA, after a reasonable opportunity for review and comment by CDPHE, agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify RMBC in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

51.     If EPA, after a reasonable opportunity for review and comment by CDPHE, does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, EPA will notify RMBC in writing of its decision.

52.     If RMBC elects to invoke the dispute resolution procedures set forth in Section XII (Dispute Resolution), it shall do so no later than thirty (30) Days after receipt of EPA's notice. In any such proceeding, RMBC shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that RMBC complied with the requirements of Paragraphs 48 and 49. If RMBC carries this burden, the delay at issue shall be deemed not to be a violation by RMBC of the affected obligation of this Consent Decree identified to EPA and the Court.

## XII.   DISPUTE RESOLUTION

53.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. RMBC's failure to seek resolution of a dispute under this Section shall preclude RMBC from raising any such issue as a defense to an action by the United States to enforce any obligation of RMBC arising under this Consent Decree.

54.     Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when RMBC sends the United States and CDPHE, in accordance with Section XVI (Notices) of this Consent Decree, a written Notice of Dispute, or when the United States or Colorado sends RMBC a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date of the Notice of Dispute, unless extended by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within thirty (30) Days after the conclusion of the informal negotiation period, RMBC invokes formal dispute resolution procedures as set forth below.

55.     Formal Dispute Resolution. RMBC shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and CDPHE, in accordance with Section XVI (Notices) of this Consent Decree, a written Statement of Position regarding the matter in dispute. The Statement of Position shall include,

but need not be limited to, any factual data, analysis, or opinion supporting RMBC's position and any supporting documentation relied upon by RMBC.

56.     The United States shall serve its Statement of Position, in accordance with Section XVI (Notices) of this Consent Decree, within forty-five (45) Days of receipt of RMBC's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on RMBC, unless RMBC files a motion for judicial review of the dispute in accordance with the following Paragraph.

57.     RMBC may seek judicial review of the dispute by filing with the Court and serving on the United States and CDPHE, in accordance with Section XVI (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute. The motion must be filed within fifteen (15) Days of receipt of the Statement of Position of the United States pursuant to the preceding Paragraph. The motion shall contain a written statement of RMBC's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

58.     The United States shall respond to RMBC's motion within the time period allowed by the Local Rules of this Court. RMBC may file a reply memorandum, to the extent permitted by the Local Rules.

59. <u>Standard of Review</u>.

a. <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 55 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, RMBC shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b. <u>Other Disputes</u>. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 55, RMBC shall bear the burden of demonstrating that its position complies with this Consent Decree.

60. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of RMBC under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 43. If RMBC does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X (Stipulated Penalties).

## XIII.   INFORMATION COLLECTION AND RETENTION

61.    The United States and CDPHE, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into the Facility, at all reasonable times, upon presentation of credentials, to:

a.    monitor the progress of activities required under this Consent Decree;

b.    verify any data or information submitted to the United States or CDPHE in accordance with the terms of this Consent Decree;

c.    obtain samples and, upon request, splits of any samples taken by RMBC or its representatives, contractors, or consultants;

d.    obtain documentary evidence, including photographs and similar data; and

e.    assess RMBC's compliance with this Consent Decree.

62.    Upon request, RMBC shall provide EPA and CDPHE or their authorized representatives splits of any samples taken by RMBC. Upon request, EPA and CDPHE shall provide RMBC splits of any samples taken by EPA or CDPHE. The rights set forth in this Section are in addition to, and shall not be construed to limit, the rights of CDPHE prescribed in § 25-7-111, C.R.S.

63.    Until three (3) years after the termination of this Consent Decree, RMBC shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to RMBC's performance of its obligations under this Consent Decree. This information-retention

requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States or CDPHE, RMBC shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

64.     At the conclusion of the information-retention period provided in the preceding Paragraph, RMBC shall notify the United States and CDPHE at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or CDPHE, RMBC shall deliver any such documents, records, or other information to EPA or CDPHE. RMBC may assert that certain documents, records, or other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If RMBC asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by RMBC. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

65.     RMBC may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that RMBC seeks to protect as CBI, RMBC shall follow the procedures set forth in 40 C.F.R. Part 2.

66.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or CDPHE pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of RMBC to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits, including but not limited to § 25-7-111, C.R.S.

## XIV.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

67.     Entry of this Consent Decree shall resolve all civil liability of RMBC to the United States and Colorado that arose from any construction, modification, or change in the method of operation commenced at the RMBC Facility prior to the Date of Lodging of this Consent Decree, under any or all of:

a.     Parts C or D of Subchapter I of the Clean Air Act, 42 U.S.C. §§7470-7492, 7501-7515, and the regulations promulgated thereunder at 40 C.F.R. §52.21, 40 C.F.R. §§ 51.165(a) and (b), 40 C.F.R. Part 51, Appendix S and 40 C.F.R. §52.24;

b.     Sections 502(a) and 504(a) of Title V of the Clean Air Act, 42 U.S.C. §§ 7661a(a),  c(a) and (f), but only to the extent that such claims are based on RMBC's failure to obtain a Permit that reflects applicable requirements imposed under Parts C or D of Subchapter I of the Clean Air Act;

c.     The federally-approved and enforceable State Implementation Plan for Colorado;

d.     Any State or local law counterparts to the provisions above in this Section; and

e.    Any allegations set forth in the Notice of Violation issued February 1,

2012, Docket No. CAA-08-2012-0002, or the Complaint.

The terms "construction" and "modification" as used in this Section shall have the meanings

those terms are given under the Clean Air Act and under the implementing regulations in effect

on or prior to the Date of Lodging of this Consent Decree or any State or local counterpart, rule

or regulation in effect on or prior to the Date of Lodging.  The resolution of liability set forth in

the Paragraph shall apply and only apply for the pollutants $NO_X$ and $SO_2$ and no other pollutant.

68.    The United States and Colorado reserve all legal and equitable remedies available

to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to

limit the rights of the United States or Colorado to obtain penalties or injunctive relief under the

CAA or implementing regulations, or under other federal or state laws, regulations, or permit

conditions, except as expressly specified in the preceding Paragraph. The United States and

Colorado further reserve all legal and equitable remedies to address any imminent and

substantial endangerment to the public health or welfare or the environment arising at, or posed

by, the Facility, whether related to the violations addressed in this Consent Decree or otherwise.

69.    In any subsequent administrative or judicial proceeding initiated by the United

States or Colorado for injunctive relief, civil penalties, other appropriate relief relating to the

Facility or RMBC's violations, RMBC shall not assert, and may not maintain, any defense or

claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion,

claim preclusion, claim-splitting, or other defenses based upon any contention that the claims

raised by the United States or Colorado in the subsequent proceeding were or should have been

brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 67 of this Section.

70.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations. RMBC is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits, and RMBC's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and Colorado do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that RMBC's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CAA, 42 U.S.C. §§ 7401, et seq., or with any other provisions of federal, state, or local laws, regulations, or permits.

71.     This Consent Decree does not limit or affect the rights of RMBC or of the United States or Colorado against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against RMBC, except as otherwise provided by law.

72.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XV.   COSTS

73.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and Colorado shall be entitled to collect the costs (including attorneys' fees) incurred in any action to enforce this Consent Decree provided that the United States or Colorado prevails in the action.

## XVI.   <u>NOTICES</u>

74.     Unless otherwise specified herein, whenever notifications, submissions, statements of position, or communications are required by this Consent Decree, they shall be made in writing, addressed as follows:

<u>To the United States:</u>

EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611
Re: DOJ No. 90-5-2-1-10146

<u>To EPA:</u>

Director, Air Enforcement Division
U.S. Environmental Protection Agency
Office of Civil Enforcement
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code 2242-A
Washington, DC 20460

Director, Air & Toxics Technical Enforcement Program
Office of Enforcement, Compliance & Environmental Justice
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, CO  80202-1129

<u>To CDPHE</u>:

Compliance and Enforcement Program Manager
Colorado Department of Public Health and Environment
Air Pollution Control Division
APCD-SSP-B1
4300 Cherry Creek Drive South
Denver, CO  80246-1530

First Assistant Attorney General
Air Quality Unit
Colorado Attorney General's Office
1300 Broadway, 7th Floor
Denver, CO  80203

To RMBC:

Plant Manager
Rocky Mountain Bottle Company
10619 West 50th Avenue
Wheat Ridge, CO  80033-6717

Chief Legal Officer
MillerCoors LLC
250 South Wacker Drive
Chicago, IL  60606

75.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

76.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing or emailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

### XVII.  SALES OR TRANSFER OF OPERATIONAL OR OWNERSHIP INTERESTS

77.     No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Section or otherwise, shall relieve RMBC of its obligation to ensure that the terms of this Consent Decree are implemented unless the requirements of this Section are implemented and the Court consents to relieve RMBC of its obligations under the Consent Decree. Any attempt to transfer ownership or operation of the Facility without complying with this Section constitutes a violation of this Consent Decree.

78.     At least 45 Days prior to any such transfer, RMBC shall provide a copy of this

Consent Decree to the proposed transferee(s) and shall simultaneously provide written notice of

the prospective transfer, together with a copy of the proposed written agreement, to the United

States, EPA, and CDPHE, in accordance with Section XVI of this Decree (Notices).

79.     RMBC shall expressly condition any transfer, in whole or in part, of ownership

of, operation of, or other interest (exclusive of any non-controlling, non-operational shareholder

or membership interest) in the Facility, upon the execution by the transferee of a modification to

this Consent Decree. This modification shall make the terms and conditions of this Consent

Decree applicable to and binding upon the transferee, and shall substitute the transferee for

RMBC as the Party to the Consent Decree that is responsible for complying with the transferred

obligations. In the event of such transfer, RMBC shall provide notice of the transfer to the United

States and Colorado in accordance with the preceding Paragraph.

80.     By no later than 60 days after providing notice of the transfer, RMBC shall send

the United States and the State a draft motion and modification of the Consent Decree to

substitute the transferee for RMBC that: (a) shows that the transferee has the financial and

technical ability to timely comply with all requirements of this Consent Decree, and (b) shows

that the modification effectively transfers the obligations and liabilities under the Consent Decree

from RMBC to the transferee.  If the United States and the State approve the proposed

modification of the Consent Decree to substitute parties, RMBC may file the motion as being

uncontested.  If the United States and the State disapprove of the proposed modification of

Consent Decree to substitute parties within 30 days of receipt, or do not approve or disapprove

the proposed modification of the Consent Decree to substitute parties within 30 days of receipt,

RMBC may file a motion for the approval of the proposed modification of the Consent Decree to substitute parties, which motion shall be granted upon a showing that the proposed transferee has the financial and technical ability to timely comply with all requirements of this Consent Decree, and that the proposed modification effectively transfers the obligations and liabilities under the Consent Decree from RMBC to the transferee.  The United States or the State may oppose the Motion if they disagree that the proposed transferee has the financial and technical ability to timely comply with all requirements of this Consent Decree, or if they disagree that the proposed modification effectively transfers the obligations and liabilities under the Consent Decree from RMBC to the transferee.

## XVIII. EFFECTIVE DATE

81.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XIX.   RETENTION OF JURISDICTION

82.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of: 1) resolving disputes arising under this Consent Decree pursuant to Section XII (Dispute Resolution), 2) entering orders modifying this Decree pursuant to Section XX (Modification), or 3) effectuating or enforcing compliance with the terms of this Consent Decree.

## XX.   MODIFICATION

83.     Except as provided in Paragraph 75, the terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all

the Parties. Where the modification constitutes a material change to the Consent Decree, it shall

be effective only upon approval by the Court.

84.     Any disputes concerning modification of this Consent Decree shall be resolved

pursuant to Section XII (Dispute Resolution) of this Decree, provided, however, that, instead of

the burden of proof provided by Paragraph 59, the Party seeking the modification bears the

burden of demonstrating that it is entitled to the requested modification in accordance with

Federal Rule of Civil Procedure 60(b).

## XXI.   TERMINATION

85.     After RMBC has (i) maintained continuous satisfactory compliance with the

requirements of Section IV (Compliance Requirements) and Section VIII (Reporting

Requirements) for at least a two (2) year period from the first Day that the final $NO_X$ and $SO_2$

limits in Section IV (Compliance Requirements) are in effect; (ii) obtained a Title V Operating

Permit amendment/modification that incorporates the final $NO_X$ and $SO_2$ emission limits

required herein, and has obtained all other permits required by this Consent Decree; and (iii) paid

the civil penalty and any accrued stipulated penalties as provided under Sections V (Civil

Penalty) and X (Stipulated Penalties) of this Consent Decree, RMBC may serve upon the United

States and CDPHE a Request for Termination, stating that RMBC has satisfied those

requirements, together with all necessary supporting documentation.

86.     Following receipt by the United States and CDPHE of RMBC's Request for

Termination, the Parties shall confer informally concerning the Request and any disagreement

that the Parties may have as to whether RMBC has satisfactorily complied with the requirements

for termination of this Consent Decree.  If the United States, after consultation with Colorado,

agrees that the Consent Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree.

87.     If the United States, after consultation with Colorado, does not agree that the Decree may be terminated, or the United States does not respond to the Request for Termination, RMBC may invoke Dispute Resolution under Section XII (Dispute Resolution) of the Consent Decree. However, RMBC shall not seek Dispute Resolution of any dispute or the absence of a response by the United States regarding termination until sixty (60) Days after service of its Request for Termination.

## XXII.  PUBLIC PARTICIPATION

88.     This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. RMBC consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States has notified RMBC in writing that it no longer supports entry of the Consent Decree.

## XXIII.  SIGNATORIES/SERVICE

89.     Each undersigned representative of RMBC, Colorado, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

90.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. RMBC agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIV. INTEGRATION

91.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of the Consent Decree.

## XXV.  APPENDICES

92.     The following appendices are attached to and incorporated as part of this Consent Decree:

"Appendix A" is the February 1, 2012, Notice of Violation.

## XXVI. JUDGMENT

93.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to each Party. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

Dated and entered this ___4th___ day of ___October_____, 2017.


___s/ Wiley Y. Daniel_____
UNITED STATES DISTRICT JUDGE
District of Colorado

THE UNDERSIGNED PARTIES enter into this Consent Decree entered in the matter of the *United States of America and State of Colorado. v. Rocky Mountain Bottle Company, LLC* (D. Colorado).

**FOR THE UNITED STATES OF AMERICA:**


NATHANIEL DOUGLAS
Deputy Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice


JAMES D. FREEMAN
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
999 18th Street, South Terrace Suite 370
Denver, CO 80202
303.844.1489 (Phone)
303.844.1350 (Fax)
james.freeman2@usdoj.gov

THE UNDERSIGNED PARTIES enter into this Consent Decree entered in the matter of the *United States of America and State of Colorado v. Rocky Mountain Bottle Company, LLC* (D. Colorado).

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:**

LAWRENCE STARFIELD
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

SUSAN SHINKMAN
Director
Office of Civil Enforcement
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

PHILLIP A. BROOKS
Director
Air Enforcement Division
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

TAHANI A. RIVERS
Attorney Advisor
Air Enforcement Division
United States Environmental Protection Agency
5 Post Office Square
Boston, MA 02109

THE UNDERSIGNED PARTIES enter into this Consent Decree entered in the matter of the *United States of America and the State of Colorado v. Rocky Mountain Bottle Company, Inc.* (D. Colorado).

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:**

KIMBERLY S. OPEKAR
Acting Assistant Regional Administrator
Office of Enforcement, Compliance
  and Environmental Justice
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, CO 80202-1129

SHELDON H. MULLER
Senior Attorney
Legal Enforcement Program
Office of Enforcement, Compliance
  and Environmental Justice
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, CO 80202-1129

THE UNDERSIGNED PARTIES enter into this Consent Decree entered in the matter of the *United States of America and the State of Colorado. v. Rocky Mountain Bottle Company, LLC* (D. Colorado).

**FOR THE STATE OF COLORADO:**

6-21-17

THOMAS A. ROAN
First Assistant Attorney General
Natural Resources and Environmental Section
Colorado Department of Law
1300 Broadway, 7th Floor
Denver, CO 80203

**FOR THE COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT:**

GARRISON W. KAUFMAN
Director, Air Pollution Control Division
Colorado Department of Public Health &
Environment
APCD-ADM-B1
4300 Cherry Creek Drive South
Denver, CO 80246

THE UNDERSIGNED PARTIES enter into this Consent Decree entered in the matter of the *United States of America and the State of Colorado. v. Rocky Mountain Bottle Company, Inc.* (D. Colorado).

**FOR ROCKY MOUNTAIN BOTTLE COMPANY, LLC:**

WILLIAM DILLAMAN
Plant Manager, Rocky Mountain Bottle Company
10619 West 50th Avenue
Wheat Ridge, CO  80033

**ATTORNEYS FOR ROCKY MOUNTAIN
BOTTLE COMPANY, LLC:**

PATRICK J. TOFT
MillerCoors LLC
Assistant General Counsel
3939 West Highland Boulevard
Milwaukee, WI 53208

SUSAN L. SMITH
Owens-Illinois, Inc.
Intellectual Property and Environmental Counsel
Three O-I Plaza - Legal Department
One Michael Owens Way
Perrysburg, OH  43551-2999

**APPENDIX A**
**FEBRUARY 1, 2012, NOTICE OF VIOLATION**

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 8

2012 FEB -1  AM 11: 40

FILED
EPA REGION VIII
HEARING CLERK

| | | |
|---|---|---|
| IN THE MATTER OF | ) | NOTICE OF VIOLATION |
| | ) | |
| **Rocky Mountain Bottle Company, LLC** | ) | Docket No.  CAA–08–2012–0002 |
| | ) | |
| **10619 West 50th Ave.** | ) | Proceedings Pursuant to Sections |
| **Wheat Ridge, CO** | ) | 113(a)(1) and (3) of the Clean Air Act, |
| | ) | 42 U.S.C. § 7413(a)(1) and (3) |
| **Respondent.** | ) | |
| | ) | |

## STATUTORY AUTHORITY

The United States Environmental Protection Agency (EPA) is issuing this Notice Of Violation (NOV) to Rocky Mountain Bottle Company, LLC (Respondent) for violations of the Clean Air Act (the Act) and the Colorado State Implementation Plan (SIP), at its glass manufacturing plant located in Wheat Ridge, Jefferson County, Colorado (the Facility).

This NOV is issued pursuant to Sections 113(a)(1) and (3) of the Act, as amended on November 15, 1990 by P.L. 101-549, 42 U.S.C. § 7413(a)(1) and (3). The authority to issue NOVs has been delegated to the Regional Administrator of EPA Region 8, and redelegated to the Assistant Regional Administrator of EPA Region 8's Office of Enforcement, Compliance and Environmental Justice. A description of the regulatory background, the relevant facts, and a list of the specific violations identified by EPA are outlined below. The geographical jurisdiction of EPA Region 8 includes the State of Colorado.

## STATUTORY AND REGULATORY BACKGROUND

1.     The Act is designed to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

### Requirements for New Source Review Permits

2.     On June 19, 1978, EPA promulgated the Prevention of Significant Deterioration (PSD) provisions of Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492. 43 Fed. Reg. 26388. Federal PSD regulations are codified at 40 C.F.R. § 52.21. The New Source Review (NSR) provisions of Parts C and D of Title I of the Act require preconstruction review and permitting for modifications of stationary sources. Pursuant to applicable regulations, if a major stationary source is planning to make a major modification, then that source must obtain either a PSD permit or a nonattainment NSR (NNSR) permit, depending on whether the source is located in an attainment or unclassifiable area, or in a nonattainment area, for the pollutant being increased above the significance level. To obtain the required permit, the source must agree to install the Best Available Control Technology

(BACT) in an attainment or unclassifiable area, or achieve the Lowest Achievable Emission Rate (LAER) in a nonattainment area.

3.       Section 165(a) of the Act, 42 U.S.C. § 7475, provides, among other things, that no major emitting facility on which construction is commenced after Aug. 7, 1977, may be constructed or modified in any area that is in attainment with the National Ambient Air Quality Standards (NAAQS) unless:

      a.  a preconstruction PSD permit has been issued for the proposed facility or modification;

      b.  the proposed permit has been subject to a review in accordance with Section 165 of the Act, the required analysis has been conducted in accordance with the PSD regulations, and a public hearing has been held with opportunity for interested persons to appear and submit written or oral presentations on the air quality impact of such source, alternatives thereto, control technology requirements, and other appropriate considerations;

      c.  the owner or operator of such facility demonstrates, as required pursuant to section 110(j) of the Act, that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (1) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which the PSD regulations apply more than one time per year, (2) NAAQS in any air quality control region, or (3) any other applicable emission standard or standard of performance under the Act;

      d.  the proposed facility is subject to the best available control technology for each pollutant subject to regulation under the Act emitted from, or which results from, such facility;

      e.  the provisions of Section 165(d) with respect to protection of class I areas have been complied with for such facility;

      f.  there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility; and

      g.  the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under the PSD regulations agrees to conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, or is having, on air quality in any area which may be affected by emissions from such source.[1]

4.       40 C.F.R. § 52.21(a) provides that the PSD regulations apply to the construction of any new major stationary source or any project at an existing major stationary source in an area designated as attainment or unclassifiable under Sections 107(d)(1)(A)(ii) or (iii) of the Act.

---

[1] All references to the Colorado SIP, the Clean Air Act, and the Code of Federal Regulations (C.F.R.), unless stated otherwise, are to the SIP, the Act, and the C.F.R. that were in effect at the time of the violations set forth in this NOV.

5.   40 C.F.R. § 52.21(i)(l) provides that no stationary source or modification to which the requirements of 40 C.F.R. § 52.21(j) through (r) apply may begin construction without a permit which states that the stationary source or modification will meet those requirements.

6.   40 C.F.R. § 52.21(i)(2) and (3) provide that the requirements of 40 C.F.R. § 52.21(j) through (r) are applicable to any major stationary source and any major modification that would be constructed in an area designated under the Act as in attainment with the NAAQS, with respect to each pollutant subject to regulation under the Act.

7.   Sections 110 and 161 of the Act, 42 U.S.C. §§ 7410 and 7471, require that each SIP include a PSD permit program. EPA approved Colorado's PSD program as part of the Colorado SIP on September 2, 1986 and the approval became effective that same date. 51 Fed. Reg. 31125. EPA approved subsequent modifications to the portion of Colorado's SIP related to Colorado's PSD program, including approvals dated February 13, 1987, June 15, 1987, December 1, 1988, March 28, 1991, June 17, 1992, September 27, 1993, and August 18, 1994.

8.   The Colorado SIP for PSD and NNSR provides that no emission unit or source subject to that rule shall be constructed without obtaining an air construction permit that meets the requirements of that rule. The PSD and NNSR provisions of the Colorado SIP can be found in the Colorado Air Quality Control Commission Common Provisions and Regulation No. 3, 5 CCR 1001-2 and 1001-5. Since the Common Provisions and Regulation No. 3 are part of the Colorado SIP, they are federally enforceable pursuant to Sections 110 and 113 of the Act, 42 U.S.C. § 7410 and § 7413.

9.   The Colorado SIP and 40 C.F.R. § 52.21(b)(1)(i) define a "major stationary source" as, *inter alia*, any stationary source that emits or has the potential to emit 250 tons per year or more of any air pollutant subject to regulation under the Act. For purposes of determining applicability of major NNSR review in a nonattainment area and the applicability of Regulation 3, Part B, Section IV.D.2, the Colorado SIP defines "major stationary source" as any stationary source of air pollutants which emits, or has the potential to emit, one hundred (100) tons per year or more of any pollutant regulated under the Act for which the area is nonattainment. Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section I.B.3.a (applicable to NNSR) and I.B.3.b.ii (applicable to PSD) (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part A, Section I.B.58, *see* "Major Stationary Source," subsections a. (applicable to NNSR) and b.ii (applicable to PSD) (Colorado SIP 110(h) Compilation as of 11/15/1998).[2]  As of August 18, 1994, in the Denver Metropolitan PM-10 (particulate matter with a diameter of 10 micrometers or less) nonattainment area, any net emissions increase that is significant for sulfur dioxide ($SO_2$) or nitrogen oxides ($NO_x$) shall be considered significant for PM-10.

10.   The Colorado SIP and 40 C.F.R. § 52.21(b)(2)(i) define a "major modification" as any physical change in or change in the method of operation of a "major stationary source" that would result in a significant net emissions increase of any pollutant subject to regulation under the Act. Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section I.B.2 (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission

---

[2] The cited references of authority were substantively the same at the time of the 1991 plant modifications referenced in paragraph 41.

Regulation No. 3, 5 CCR 1001-5, Part A, Section I. B.35.B (Colorado SIP 110(h) Compilation as of 11/15/1998).

11.     The Colorado SIP and 40 C.F.R. § 52.21(b)(3)(i) define "net emissions increase" as the amount by which the sum of the following exceeds zero:

   a.   Any increase in actual emissions from a particular physical change or change in method of operation at a stationary source; and

   b.   Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

*See* "Common Provisions Regulation", 5 CCR 1001 – 2 Section I.G, *see* "Net Emission Increase," subsections a.i and ii (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part A, Section I.B.36.a.i and ii (Colorado SIP 110(h) Compilation as of 11/15/1998).

12.     The Colorado SIP and 40 C.F.R. § 52.21(b)(21) define "actual emissions" as the rate of emissions of a pollutant from an emissions unit, which, as of a particular date, are the actual emissions, in tons per year, at which the unit emitted the pollutant during a two-year period which precedes the particular date and is representative of normal unit operation, and are calculated using actual operating hours, production rates, and types of materials processed, stored or combusted during the selected time period. *See* "Common Provisions Regulation", 5 CCR 1001 – 2 Section I.G, "Actual Emissions," subsections a and c (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part A, Section I.B.1.a and c (Colorado SIP 110(h) Compilation as of 11/15/1998).

13.     The Colorado SIP and 40 C.F.R. § 52.21(b)(23) define "significant" and state that in reference to $NO_x$ and $SO_2$, significant net emissions increase means an emissions rate that would equal or exceed 40 tons or more per year of $NO_x$, or 40 tons or more per year of $SO_2$. 40 C.F.R. § 52.21(b)(23)(i). *See* "Common Provisions Regulation", 5 CCR 1001 – 2 Section I.G, "significant," subsection a (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part A, Section I.B.57.a (Colorado SIP 110(h) Compilation as of 11/15/1998).

14.     An applicant for a permit to modify a stationary source is required to submit all information necessary to allow the permitting authority to perform any analysis or make any determination required in order to issue the appropriate permit. 40 C.F.R. § 52.21(n). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section IV.B.2-3 (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part B, Section IV.B.2-3 (Colorado SIP 110(h) Compilation as of 11/15/1998).

15.     The Colorado SIP states that "…no person shall commence construction of any stationary source or modification of a stationary source without first obtaining or having a valid construction permit…" . Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Sections I.A and III.A.1 (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control

Commission Regulation No. 3, 5 CCR 1001-5, Part B, Sections I.A and III.A.1 (Colorado SIP 110(h) Compilation as of 11/15/1998). The Colorado SIP further requires, *inter alia*, that a source subject to PSD regulations undergo a control technology review, install BACT, and conduct air quality modeling. Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Sections IV.D.3.a and IV.D.3.a.i-vi (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part B, Sections IV.D.3.a and IV.D.3.a.i-vi (Colorado SIP 110(h) Compilation as of 11/15/1998). *See also* 40 C.F.R. § 52.21(i) which prohibits the construction of any new major stationary source or any major modification without a permit which states that the source or modification would meet the requirements of 40 C.F.R. § 52.21(j) through (r). 40 C.F.R. § 52.21(i)(2) and (3) provide that the requirements of 40 C.F.R. §§ 52.21(j) through (r) are applicable to any major source and any major modification that would be constructed in an area designated under the Act as in attainment with the NAAQS, with respect to each pollutant subject to regulation under the Act.

16.     The Colorado SIP and 40 C.F.R. § 52.21(b)(12), define "BACT" as an emissions limitation based on the maximum degree of reduction for each regulated PSD pollutant that would be emitted from any proposed major modification while taking into account energy, environmental, and economic impacts and other costs. 42 U.S.C. § 7479(3). *See* "Common Provisions Regulation", 5 CCR 1001 – 2 Section I.G, "Best Available Control Technology" (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part A, Section I.B.12 (Colorado SIP 110(h) Compilation as of 11/15/1998).

17.     Section 107(d) of the Act, 42 U.S.C. § 7407(d), requires each state to designate those areas within its boundaries in which the air quality has attained the NAAQS, those areas in which air quality has failed to attain the NAAQS, and those areas which cannot be classified due to insufficient data. The Act also requires EPA to promulgate a list of these areas and their attainment status.

18.     On August 7, 1987, the Denver metropolitan area (including Jefferson County) was designated as a "Group I" nonattainment area (area with a strong likelihood of violating the PM-10 NAAQS) for PM-10 (52 FR 29383). Pursuant to the 1990 Clean Air Act Amendments and Section 107(d)(4)(B), the Denver area was designated as a "moderate" PM-10 nonattainment area. On September 16, 2002, the Denver area was redesignated as attainment for PM-10.

19.     On March 3, 1978, EPA designated the Denver-Boulder metropolitan area (including Jefferson County) as nonattainment for the NAAQS for ozone (43 FR 8976). This designation, which was for the 1-hour ozone standard then in effect, was reaffirmed by EPA on November 6, 1991 (56 FR 56694) pursuant to Section 107(d)(1) of the Clean Air Act, as amended in 1990, classifying the Denver-Boulder metropolitan area (including Jefferson County) as a transitional ozone nonattainment area. On September 11, 2001 (effective October 11, 2001), EPA redesignated the Denver-Boulder metropolitan area to attainment for the 1-hour ozone NAAQS (66 FR 47086). In April 2004, EPA designated the Denver-Boulder metropolitan area (including Jefferson County) as nonattainment for the 8-hour ozone NAAQS, but deferred the effective date of the designation based on a commitment from state and regional agencies to implement measures set forth in the Denver Early Action Compact for Ozone. On November 20, 2007, the deferral expired, and the Denver-

Boulder-Greeley-Ft. Collins-Loveland, areas (including Jefferson County) became nonattainment for the 8-hour ozone NAAQS.

20.     On August 18, 1994, EPA conditionally approved Colorado's SIP revisions, which included nonattainment NSR provisions for sources of PM-10 precursors, $NO_x$ and $SO_2$, in the Denver metropolitan PM-10 nonattainment area. *See* 59 FR 42500. In 1997, EPA approved subsequent amendments to Colorado's SIP concerning Colorado's nonattainment NSR rules.

21.     Sections 171-193 of the Act, 42 U.S.C. §§ 7501-7515, impose SIP requirements for nonattainment areas. Among other things, the statute requires that states adopt SIP provisions establishing an NNSR program which includes permitting requirements and other requirements governing construction and operation of new and modified major sources in nonattainment areas. Pursuant to Section 173(a)(2) of the Act, a state's NNSR program must include a mandate that any modified source comply with LAER. 42 U.S.C. § 7503(a)(2). Section 173(a)(1) of the Act specifies that a state's NNSR program must also include provisions requiring the modified source to obtain offsetting emissions reductions, 42 U.S.C. § 7503(a)(1). The State of Colorado's regulatory provisions specific to NNSR are set forth in Section IV.D.2 of Regulation No. 3. *See* Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section IV.D.2.a (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part B, Section IV.D.2.a (Colorado SIP 110(h) Compilation as of 11/15/1998).

22.     The Colorado SIP and Section 171(3) of the Act define "LAER" as the most stringent emission limitation which is achieved in practice or can reasonably be expected to occur in practice by such class or category of source, taking into consideration the pollutant which must be controlled. In no event can LAER be an emission limit greater than that allowed under an applicable New Source Performance Standard. As of May 30, 1995, the Colorado SIP also required that LAER consist of the most stringent emission limit contained in any SIP for such class or category of stationary source (unless the owner or operator of the proposed source demonstrates that such limits are not achievable). *See* "Common Provisions Regulation", 5 CCR 1001 – 2 Section I.G, "Lowest Achievable Emission Rate" (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part A, Section I.B.32 (Colorado SIP 110(h) Compilation as of 11/15/1998). *See also* Section 171(3)(A) of the Act, 42 U.S.C. § 7501(3)(A).

## Requirements for Title V Operating Permits

23.     Section 502(a) of the Act, 42 U.S.C. § 7661a(a) provides that, after the effective date of any permit program approved or promulgated under Title V of the Act, no source subject to Title V may operate except in compliance with a Title V permit.

24.     Section 502(d)(1) of the Act, 42 U.S.C. § 7661a(d)(1), calls upon each State to develop and submit to EPA an operating permit program to meet the requirements of Title V.

25.     EPA first promulgated regulations governing state operating permit programs on July 21, 1992. *See* 57 Fed. Reg. 32295; 40 C.F.R. Part 70.

26.     EPA granted interim approval to the Title V operating permit program submitted by the State of Colorado effective February 23, 1995. 60 Fed. Reg. 4563 (January 24, 1995); 40 C.F.R. part 70, Appendix A.. Effective October 16, 2000, EPA granted full approval to Colorado's Title V operating permit program. 65 Fed. Reg. 49919 (August 16, 2000).

27.     Section 503 of the Act, 42 U.S.C. § 7661b, sets forth the requirement to submit a timely, accurate, and complete application for a permit, including information required to be submitted with the application.

28.     Section 504(a) of the Act, 42 U.S.C. 7661c(a), requires that each Title V permit include enforceable emission limitations and standards, a schedule of compliance, and other conditions necessary to assure compliance with applicable requirements, including those contained in a state implementation plan.

29.     40 C.F.R. § 70.5(a) and (c) require timely and complete permit applications for Title V permits with required information that must be submitted, and 40 C.F.R. § 70.6 specifies required permit content. *See also* Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part C, Sections III and V (CO SIP 110(h) Compilation as of 11/15/95).

30.     40 C.F.R. § 70.1(b) provides that "All sources subject to these regulations shall have a permit to operate that assures compliance by the source with all applicable requirements." *See also* Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part C, Sections II and V (CO SIP Compilation as of 11/15/95).

31.     40 C.F.R. § 70.2 defines "applicable requirement" to include, "(1) Any standard or other requirement provided for in the applicable implementation plan approved or promulgated by EPA through rulemaking under title I of the Act that implements the relevant requirements of the Act, including any revisions to that plan promulgated in part 52 of this chapter…" *See also* Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part C, Section V (CO SIP 110(h) Compilation as of 11/15/95).

32.     40 C.F.R. § 70.5(b) provides that: "Any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application shall, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information. In addition, an applicant shall provide additional information as necessary to address any requirements that become applicable to the source after the date it filed a complete application but prior to release of a draft permit." *See also* Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part C, Section IV (CO SIP 110(h) Compilation as of 11/15/95).

33.     40 C.F.R. § 70.7(b) provides that no source subject to Part 70 requirements may operate without a permit issued under a Part 70 program. *See also* Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part C, Section II.A.1 and 2, (CO SIP 110(h) Compilation as of 11/15/95).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

34.     The Facility is located at 10619 West 50th Avenue in Wheat Ridge, Colorado. The Facility is engaged in the manufacture of glass containers for the food and beverage industry. The Facility was purchased by the Adolph Coors Company in 1976. In 1989, the Adolph Coors Company became the Coors Brewing Company. In or around 1995, Anchor Glass and Coors Brewing Company entered into a joint venture, called Rocky Mountain Bottle Company, to own and operate the Facility. Currently, the Facility is a joint venture of Owens-Brockway Glass Container, Inc. and MillerCoors, LLC in which each has a 50% interest in Rocky Mountain Bottle Company, LLC. Respondent is a limited liability company authorized under the laws of the State of Colorado.

35.     Respondent is a "person," as that term is defined in Section 302(e) of the Act, 42 U.S.C. § 7602(e).

36.     The Facility consists, in part, of two natural-gas-fired end port regenerative glass-melting furnaces (Furnaces A & B) and one natural gas over-fire/oxy-fuel furnace (Furnace C). The Facility also includes equipment that supports the glass manufacturing process, such as forming machines and cullet processing.

37.     The Facility is located in Jefferson County, Colorado. Jefferson County was designated as a non-attainment area for PM-10 and ozone during the time of the 1991 modification and the 1995-1999 furnace modifications referenced below, and is currently designated as nonattainment for the 8-hour ozone standard. 40 C.F.R. § 81.306.

38.     The three furnaces operated by Respondent are subject to Title V Operating Permit No. 95OPJE053, issued to Respondent on October 1, 2001, last revised October 6, 2004, as well as applicable requirements of underlying Construction Permit No. 92JE129-1.

39.     The Facility emits or has the potential to emit at least 250 tons per year of $NO_x$ and $SO_2$ and is a "major stationary source" under the Act and the Colorado SIP for PSD, NNSR and Title V.

40.     EPA issued information requests pursuant to the authority of Section 114 of the Act, 42 U.S.C. § 7414, (Information Requests) dated May 31, 2008 and May 27, 2009, requiring Respondent to submit specific information regarding the Facility.

41.     Respondent responded to EPA's Information Requests with submittals dated June 16, 2008, and August 11, 2009 (Respondent's Responses). Respondent's Responses discussed modifications to Furnace A in 1991, which included, but were not limited to, modifications to the melter, regenerator, and forehearths/refiners that were to occur in conjunction with rebricking. These changes resulted in a "significant net emissions increase" of $NO_x$.

42.     Respondent's Responses to EPA's Information Requests also detailed information related to modifications of the three glass furnaces in or about 1995, 1996, and 1999 (the Furnace Expansion Project) that included, but were not limited to, "extensive reworkings of many of the plant operations" and "increased production by approximately 40%." As described in a 1994 permit

application, "Phase 1 activities would include the re-machining of Furnace 1, and the addition of staged combustion capability to Furnace 1. Both phase 2 and phase 3 would include the remaching of the respective furnaces to [narrow neck press and blow] NNPD glass forming machines and the addition of staged combustion capability."[3]

43.    The 1991 modification to Furnace A constituted a "major modification" for $NO_x$ under the PSD program and the Furnace Expansion Project constituted a "major modification" for $NO_x$ and $SO_2$ under the PSD and NNSR programs. A review of the Colorado Department of Public Health and Environment (CDPHE) records and Respondent's Responses, did not reveal any evidence that Respondent applied for a PSD permit for $NO_x$ or $SO_2$, or a NNSR permit for PM-10 prior to these major modifications or at any time prior to the date of this Notice of Violation.

44.    On November 7, 1994, Respondent applied for a "synthetic minor" NSR permit modification to cover the Furnace Expansion Project. The application used proposed emission reductions of $NO_x$ (by installation of oxygen-enriched air staging (OEAS) technology for the three furnaces) and existing emission reductions of $SO_2$ (by historic raw material changes) to calculate a less than "significant net emissions increase" for the project. On June 29, 1995, CDPHE issued the "synthetic minor" NSR permit modification largely based on Respondent's representations made in its application. However, according to Respondent's Responses to EPA's Information Requests, Respondent only installed and temporarily operated the proposed combustion $NO_x$ controls on Furnace A before discontinuing any $NO_x$ controls on that furnace. Additionally, Respondent never added $NO_x$ controls on Furnace B that would have offset expected $NO_x$ emission increases from the permitted increase in production, as represented in the permit application. Furthermore, Respondent's Responses to EPA's Information Requests revealed that the maximum amount of $SO_2$ reduction in the period contemporaneous to the furnace expansion project that could be considered creditable was not sufficient to offset the permitted $SO_2$ increases. The result was a "significant net emission increase" in $NO_x$ and $SO_2$.

## NOTICE AND FINDINGS OF VIOLATION

45.    Pursuant to the Colorado SIP and 40 C.F.R. § 52.21(r), any owner or operator who constructs or operates a source or modification, without obtaining a permit, will be subject to an appropriate enforcement action. The Furnace Expansion Project conducted by Respondent caused a "significant net emissions increase" of $NO_x$ and $SO_2$, and the 1991 modification caused a "significant net emissions increase" of $NO_x$, resulting in each being a "major modification" as defined in the Colorado SIP and 40 C.F.R. § 52.21(b)(2)(i). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section I.B.2 (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part A, Section I.B.35.B (Colorado SIP 110(h) Compilation as of 11/15/1998).

46.    With respect to the modifications outlined in paragraphs 41 - 42, Respondent failed to obtain a PSD permit or undergo PSD review, prior to commencing construction, and failed to apply BACT and conduct an air modeling analysis, in violation of Section 165(a)(1) of the Act, 42 U.S.C. § 7475(a)(1), 40 C.F.R. § 52.21(i) and (j) through (r), and the Colorado SIP,. Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Sections I.A, III.A.1, IV.D.3.a and

---

[3] Respondent at times has referred to Furnaces A, B and C, as Furnaces 1, 2 and 3, respectively.

IV.D.3.a.i-vi (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part B, Sections I.A and III.A.1 & Part B, Sections IV.D.3.a. and IV.D.3.a.i-vi (Colorado SIP 110(h) Compilation as of 11/15/1998).

47.     As stated in Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section IV.D.2.a, for any new "major stationary source" or "major modification", the applicant must provide information outlined in that section for a nonattainment area permit. The Denver Metropolitan area was classified as nonattainment for PM-10 during the Furnace Expansion Project. Pursuant to Colorado Air Quality Control Commission Regulation No.3, 5 CCR 1001-5, Part A, Section I.B.35.B.a, the $NO_x$ and $SO_2$ "significant net emission increases" also constitute a "significant net emission increase" for PM-10. With respect to the modifications outlined in paragraph 42, Respondent failed to obtain a NNSR permit prior to commencing construction, and failed to apply LAER, obtain offsets, and comply with the other requirements in Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section IV.D.2.a, in violation of Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section IV.D.2.a. (Colorado SIP 110(h) Compilation as of 11/15/1995). Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part B, Section IV.D.2.a (Colorado SIP 110(h) Compilation as of 11/15/1998).

48.     The violations noted in paragraphs 46 – 47 occurred from at least the start date of the construction of the modifications and continue until the appropriate permits are obtained, the necessary pollution control equipment is installed and operated, and Respondent establishes continuous compliance with the above-cited requirements.

49.     It is a violation to operate each affected source without BACT controls for $NO_x$ and $SO_2$ every day of such operation. It is a violation to operate each affected source without achieving LAER for $NO_x$ and $SO_2$, obtaining necessary offsets, and complying with the other requirements of Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section IV.D.2.a, every day of such operation.

50.     Respondent is in violation of the Title V permitting requirements because it failed and continues to fail to submit a timely and complete application for a Title V operating permit for the modified Facility, including updating its existing application to include all applicable requirements, including the requirement to meet BACT limits and LAER for a modified source.

## ENFORCEMENT

51.     Section 113(a)(1) and (3) of the Act, 42 U.S.C. § 7413(a)(1) and (3), provide that at any time after the expiration of thirty (30) days following the date of the issuance of this NOV, the Regional Administrator may, without regard to the period of violation, issue an order requiring compliance with the requirements of the Act, SIP or permit, and/or bring a civil action pursuant to Section 113(b) for injunctive relief and/or civil penalties of not more than $25,000 per day for each violation that occurred through January 30, 1997, no more than $27,500 per day for each violation that occurred after January 30, 1997 through March 15, 2004, no more than $32,500 per day for each violation that occurred after March 15, 2004 through January 12, 2009, and no more than $37,500 per day for each violation that occurred after January 12, 2009. Section 113(c) of the Act, 42 U.S.C.

10

§ 7413(c), provides that criminal sanctions may also be imposed to redress knowing violations of the Act. Section 306 of the Act, 42 U.S.C. § 7606, allows that any facility found in violation of the Act may be barred from federal grants, loans, or contracts.

## OPPORTUNITY FOR CONFERENCE

52.    Respondent may, upon request, confer with EPA. The conference will enable Respondent to present evidence bearing on the findings of violations, on the nature of the violations, and on any efforts Respondent may have taken or proposes to take to achieve compliance. Respondent has the right to be represented by counsel. A request for a conference must be made within ten (10) calendar days of receipt of this NOV, and the request for a conference or other inquiries concerning the NOV should be made in writing to:

> Sheldon H. Muller (Mail Code 8ENF-L)
> Senior Enforcement Attorney
> Office of Enforcement, Compliance and
> Environmental Justice
> U.S. EPA Region 8
> 1595 Wynkoop St.
> Denver, CO 80202-1129
> muller.sheldon@epa.gov
> 303-312-6916

By offering the opportunity for a conference or participating in one, EPA does not waive or limit its right to any remedy available under the Act.

## EFFECTIVE DATE

53.    This NOV shall be effective immediately upon issuance.

Date Issued: February 1       , 2011. 2012

Andrew M. Gaydosh
Assistant Regional Administrator
Office of Enforcement, Compliance and
   Environmental Justice

cc:    Will Allison, Director
       Air Pollution Control Division
       Colorado Department of Public Health and Environment

       Phillip A. Brooks, Director
       Air Enforcement Division
       Office of Enforcement and Compliance Assurance
       United States Environmental Protection Agency

IN THE MATTER OF:        **ROCKY MOUNTAIN BOTTLE, LLC**
**DOCKET NUMBER:**       **DOCKET No.  CAA-08-2012-0002**

### CERTIFICATE OF SERVICE

On this date, the undersigned hereby certifies that the original and one true and correct copy of the **NOTICE OF VIOLATION, DOCKET No.  CAA-08-2012-0002** was hand-carried to the Regional Hearing Clerk:

> Tina Artemis, Region 8 Hearing Clerk
> U.S. Environmental Protection Agency
> 1595 Wynkoop Street
> Denver, Colorado 80202-1129

That a copy of the **NOTICE OF VIOLATION, DOCKET No.  CAA-08-2012-0002** was sent via CERTIFIED MAIL/RETURN RECEIPT # 7009 3410 0000 2592 0486 along with cover letter to:

> John Kester
> Vice President and Plant Manager
> Rocky Mountain Bottle Company, LLC
> 10619 West 50th Avenue
> RR836
> Wheat Ridge, CO 80033

And that a copy the **NOTICE OF VIOLATION, DOCKET No.  CAA-08-2012-0002** along with copy of cover letter was sent by first class mail to:

> Will Allison, Director
> Air Pollution Control Division
> Colorado Department of Public Health and Environment
> 4300 Cherry Creek Drive south
> Denver, CO 80246-1530

Date:  February 1, 2012          By: _Dayle De Arvil_
                                    Dayle De Arvil